**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 15 1997**

**PATRICK FISHER**
**Clerk**

# UNITED STATES COURT OF APPEALS
# TENH CIRCUIT

JAMES BARLOW FAMILY LIMITED
PARTNERSHIP; JOHN AND LOIS
HAUN FAMILY PARTNERSHIP;
BARLOW & HAUN, INC.; L.A.
MCPEEK AND COMPANY;
BARBARA B. CREWS; B.J.
BRADSHAW ESTATE, by First
Interstate Bank of Utah, Trustee;
ALPHA EXPLORATION, INC.;
CHEVRON U.S.A., INC.,

    Plaintiffs-Appellees,

v.

DAVID M. MUNSON, INC.,

    Defendant-Appellant.

------------------------------------

UNITED STATES OF AMERICA,

    Amicus Curiae.

No. 96-1202

**ORDER**

**Entered December 15, 1997**

Before **SEYMOUR,** Chief Judge, and **HENRY,** and **BRISCOE,** Circuit Judges.

The Barlows have filed a motion to clarify our order and opinion on rehearing. Because our mandate issued on November 21, 1997, we treat the motion as one to recall the mandate. Under our inherent authority to recall the mandate for the purpose of clarifying an ambiguous prior order of the court, *see* Coleman v. Turpen, 827 F.2d 667, 671 (10th Cir. 1987); Dilley v. Alexander, 627 F.2d 407, 410-411 (D.C. Cir. 1980), we grant the motion and recall the mandate.

We clarify the opinion by eliminating the phrase on page 3 stating that we grant summary judgment in favor of Munson and by stating instead that we remand the matter for further consideration. In addition, on the last page we eliminate the phrase "and Munson thus has a complete defense to the nonpayment of royalties to the Barrows." The revised opinion is attached.

Entered for the Court

PATRICK FISHER, Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 26 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

---

JAMES BARLOW FAMILY LIMITED
PARTNERSHIP; JOHN AND LOIS
HAUN FAMILY PARTNERSHIP;
BARLOW & HAUN, INC.; L.A.
MCPEEK AND COMPANY;
BARBARA B. CREWS; B.J.
BRADSHAW ESTATE, by First
Interstate Bank of Utah, Trustee;
ALPHA EXPLORATION, INC.;
CHEVRON U.S.A., INC.,

    Plaintiffs-Appellees,

v.

DAVID M. MUNSON, INC.,

    Defendant-Appellant.

------------------------------------

UNITED STATES OF AMERICA,

    Amicus Curiae.

No. 96-1202

---

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 92-D-1817)

---

Craig R. Carver of Alfers & Carver, LLC, Denver, Colorado, for Defendant-

Appellant.

John F. Shepherd (Jane L. Montgomery with him on the brief) of Holland & Hart LLP, Denver, Colorado, for Plaintiffs-Appellees.

Peter Coppelman, Acting Assistant Attorney General; Robert L. Klarquist, Gerald L. Fish, and Jacques B. Gelin, Attorneys, Department of Justice, Environment and Natural Resources Division; and Karen Hawbecker, Of Counsel, Office of the Solicitor, Department of the Interior, Washington, D.C., on the brief for Amicus Curiae.

---

Before **SEYMOUR**, Chief Judge, **HENRY** and **BRISCOE**, Circuit Judges.

---

**SEYMOUR**, Chief Judge.

This action involves a dispute between the Barlow Family Limited Partnership and others (the Barlows), owners of overriding royalty interests in certain federal oil and gas leases located in western Colorado, and David M. Munson, Inc. (Munson), as lessee and operator, over whether the Barlows are entitled to royalty payments from the federal leases. On cross motions for summary judgment, the district court held in favor of the Barlows. On Munson's appeal, we reverse and remand.

## I.

The leases at issue in this case cover federal lands in western Colorado on which unpatented oil shale claims were located. For many years, oil shale claimants and the Department of the Interior were involved in disputes over the claimants' rights to mineral patents on these and other lands where oil shale claims were located. See generally Tosco Corp. v. Hodel, 611 F. Supp. 1130, 1145-56 (D. Colo. 1985) (discussing background of oil shale disputes). The government contended that many oil shale claims were void for lack of valid discovery and for failure of the claimants to perform required annual assessment work. It therefore refused to issue mineral patents to the subject lands. A title dispute ensued in which the oil shale claimants sued the federal government seeking to compel issuance of mineral patents. Id. (Tosco claimants); Marathon

Oil Co. v. Lujan, 751 F. Supp. 1454 (D. Colo. 1990) (Marathon claimants); Ertl v. Hodel, No. 86-M-764 (D. Colo. filed Apr. 18, 1986) (Ertl claimants) (rec., vol. II at 382). Since the mineral claims were staked prior to 1920, the claims would, if valid, entitle the claim holders to patents including all minerals on the lands. See United States v. Etcheverry, 230 F.3d 193, 195-96 (10th Cir. 1956); Union Oil Co. of Cal. v. Udall, 289 F.2d 790, 791 n.1 (D.C. Cir. 1961).

Notwithstanding the ongoing title dispute, the government issued federal oil and gas leases on some of the lands which were involved in oil shale disputes. The Barlows (or their predecessors-in-interest) acquired in the early 1970s federal leases which were subject to outstanding oil shale claims.

In the late 1970s, Munson became interested in exploring for oil and gas on federal land in western Colorado. Since much of the area of interest was covered by disputed oil shale claims, Munson was uncertain how to lease oil and gas rights. Faced with this uncertainty of title, Munson prudently acquired both private and federal oil and gas leases. Munson acquired the private leases from the estate of Tell Ertl and others (Ertl), and from Marathon Oil Company, both of which were successors in interest to oil shale claimants. Munson acquired duplicative federal oil and gas leases by assignment from the Barlows. Under the parallel lease scheme, Munson secured its right to drill for and to produce oil and

gas regardless of whether the private or the federal claims ultimately prevailed in the title dispute.

Munson also protected itself from duplicative royalty payments under the private and federal leases. The terms of the private leases provided that Munson would pay the lessors royalty for one year: if title remained unresolved after expiration of that year, Munson would, at its option, pay royalty only to the federal government pending final resolution of the title dispute. In addition, the federal unit operating agreement under which oil and gas was produced permitted Munson to hold in suspense payments of royalties due unit members until settlement of any title disputes.

There is one significant difference between the private and federal leases acquired by Munson. On the federal leases, Munson would pay not only a standard 12.5% royalty to the United States, but also a 5.8% to 11.25% overriding royalty to the Barlows which they retained as consideration for the assignment. On the private leases, however, Munson would pay only a 12.5% royalty to Ertl and to Marathon. Because its royalty burden is less under the private leases, it is in Munson's interest to have the private leases validated.

Munson discovered gas on the leases in 1980. Since the beginning of production, Munson has exercised its right under clause 27 of the unit operating agreement, to hold in escrow the royalty payments potentially due the Barlows

pending resolution of the Barlows' and Munson's competing claims to royalty payments.

The oil shale disputes were eventually settled. See Tosco Corp. v. Hodel, 826 F.2d 948 (10th Cir. 1987) (dismissing as moot the Tosco claimants' cases); Marathon Oil Co. v. Lujan, 771 F. Supp. 1556 (D. Colo. 1991) (closing Marathon case upon issuance of patent to Marathon); rec., vol. II at 384 (describing district court dismissal of the Ertl action). The Barlows contend that the settlements validated their federal leases, that Munson's conduct binds it to the contractual terms of the settlement agreements, and that any assertion of rights under the private leases constitutes an impermissible collateral attack on the validity of the settlements. Munson argues that the settlements resulted in the issuance of federal mineral patents to the oil shale claimants which, under the canons of general mining law, validated its private leases and voided the federal leases. The Barlows and Munson brought cross motions for summary judgment. The district court granted summary judgment for the Barlows and ordered Munson to pay to the Barlows the royalty payments held in suspense.

## II.

We review the district court's grant of summary judgment de novo, Ellis v. United Airlines Inc., 73 F.3d 999, 1003 (10th Cir.), cert. denied, 116 S. Ct. 2500

(1996), applying the same legal standard used by the district court under Fed. R. Civ. P. 56(c). Summary judgment should not be granted unless the evidence, viewed in the light most favorable to the party opposing the motion, shows there are no genuine issues of material fact and the moving party is due judgment as a matter of law. <u>Harrison Western Corp. v. Gulf Oil Co.</u>, 662 F.2d 690, 691-92 (10th Cir. 1981). Where, as here, the parties file cross motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts. <u>Id.</u> at 692.

We begin our analysis by reviewing and analyzing the settlement agreements to which Munson is alleged to be bound.

## A. Settlement Agreements

### 1. United States/Ertl Settlement Agreement

On August 4, 1986, Ertl entered into a settlement agreement with the United States. Rec., vol. II at 390 (Agreement To Settle Pending Litigation Between The United States And The Owners Of Certain Oil Shale Mining Claims In Colorado).[1] In order for the claimants to be able to exploit oil shale while the

---

[1]The Ertl settlement agreement is identical to that reached by the Tosco claimants. Ertl was not part of the Tosco law suit because its claims were still in administrative appeal during the pendency of that case. By the time the Tosco

United States retained the right to oil, gas and coal currently under federal lease, the United States agreed to grant the claim owners all minerals except oil, gas and coal. The United States attempted to effectuate the agreement by issuing to the claim owners standard mining claim patents in return for the claim owners' "simultaneous" conveyance by special warranty deed of all oil, gas and coal within the claims. The parties intended that the issuance of the patent and the reconveyance of the oil, gas and coal should "occur precisely simultaneously, with no temporal gap whatsoever in ownership by the United States of the interests it retains." Id. at 399. The conveyances under the settlement agreement were intended "not [to] affect the validity or duration of [the] existing [federal] oil and gas leases." Id. at 400. On November 7, 1986, Ertl was issued mineral patents covering its claims. By warranty deed signed by the relevant parties between September 18 and November 7, 1986, Ertl conveyed to the United States oil, gas and coal.

2. United States/Marathon Settlement Agreement

Marathon independently reached a settlement with the United States on June 28, 1991. Id. at 242. Their agreement stipulates that Marathon has met all

_____

settlement negotiations were instituted, the Ertl administrative appeals had run their course and Ertl had filed suit in district court. Since the Ertl claims were identical to those of the Tosco claimants, Ertl joined in the Tosco settlement negotiations. This agreement is the result of those negotiations.

requirements to receive a patent and that the United States will issue a patent without reservation to Marathon. The parties agreed that, pending a land exchange, an agent would hold the patent until June 28, 1994, and then release the patent to Marathon. During the time the agent held the patent, the parties agreed that the federal oil and gas leases on the subject lands would remain in effect. A patent was issued to Marathon on June 29, 1991. Although the language employed in the Marathon settlement is different from that used in the Ertl settlement, the intent is similar. For at least some period of time, the parties intended that, notwithstanding delivery of an unreserved patent, the federal leases would be held to be in full force and effect.[2]

3. Effect of the Conveyances Pursuant to the Settlement Agreements

Despite the intent of the parties, the instruments of title executed pursuant to the settlements do not effectively preserve the federal leases. The patents were issued without reservation of oil, gas and coal. The Ertl settlement agreement specifically describes the patent to be issued as a standard mining patent:

---

[2]The district court held that Munson was bound by the United States/Marathon settlement until June 28, 1994, at which time a patent was delivered to which general mining law applied. The court therefore held that in 1994, Marathon (and Munson through its derivative rights) had an ordinary patent which did not preserve the federal oil and gas leases. Rec., vol. II at 739.

2.3 The form of the patents to be issued by the Department of the Interior to the Claimowners shall be that of a *standard mining claim patent* granting the Claimowners *fee ownership of the entire claim*, subject only to a right-of-way thereon for ditches and canals constructed by the authority of the United States, pursuant to the Act of August 30, 1890 (43 U.S.C. 945).

Rec., vol. II at 397-98 (emphasis added).

The rights accorded holders of such unreserved patents are clear:

[W]hen a mining claim has been perfected under the law, it is in effect a grant from the United States of the exclusive right of possession to the same. It constitutes property to its fullest extent, and is real property subject to be sold, transferred, mortgaged, taxed, and inherited without infringing any right or title of the United States.

Etcheverry, 230 F.2d at 195. Upon issuance of a patent, title *relates back* to the date of original entry. Id. at 196. "'A patent from the United States operates to transfer the title, not merely from the date of the patent, but from the inception of the equitable right upon which it is based.'" Id. (quoting United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 334-35 (1906)). The consequence of relation back is that the claimant's rights and those of the claimant's assignee date from the time the claim was made, not from the time the patent was issued. Reed v. Munn, 148 F. 737, 757 (8th Cir. 1906). Under general mining law, the issuance of federal mineral patents to Ertl and to Marathon related back to the date of the original claim and validated the private leases conveyed to Munson prior to the execution of the settlements or the issuance of the patents. See id.

Moreover, the issuance of patents to holders of valid mining claims ordinarily voids federal leases. See, e.g. Union Oil Co. of Cal., 289 F.2d at 791 n.1 (federal oil and gas leases issued pursuant to the Mineral Leasing Act of 1920 not valid if the holder of a valid mining claim subsequently receives a patent); 1 ROCKY MTN. MIN. L. FOUND., LAW OF FEDERAL OIL AND GAS LEASES § 3.10 (1996); cf. Letter from Thomas L. Sansonetti, Associate Solicitor, Energy and Resources, United States Dep't of the Interior, to Assistant Secretary, Land and Minerals Management, United States Dep't of the Interior (Feb. 23, 1989) (rec., vol. I at 293).

Because Munson's rights under the Marathon lease relate back, the issuance of the Marathon patent voided the federal leases, regardless whether the patent is considered to have issued in 1991 or 1994. Thus, contrary to the district court's conclusion, rec., vol. II at 739, delivery of the patent to an agent was not effective to preserve the federal leases. Similarly, the fiction engaged in by Ertl and the United States that the patent issuance and the warranty deed were executed simultaneously so as to preserve the federal leases and to cut off Munson's rights under the private leases is simply not legally effective. Despite the recitals of the settlement, the conveyances could not be made simultaneously. Ertl must have received a patent before it could deed oil, gas and coal to the government. As the special warranty deed acknowledges, Ertl could not convey title to oil, gas and

coal unless Ertl at least momentarily held legal title. This title held by Ertl related back, and thus validated Ertl's lease to Munson. When Ertl did make the conveyance, it conveyed to the government only what it had at the time it signed the deed: rights to oil, gas and coal encumbered by a lease to Munson.

We hold that the instruments of conveyance employed to effectuate the Ertl and Marathon settlements did not cut off the rights of Munson under the private leases, notwithstanding the intent of the settling parties. Ordinarily, we would therefore conclude under general mining law that Munson has no obligation to pay the Barlows royalty on leases voided by the issuance of patents. The Barlows argue, however, and the district court held, that Munson is barred for other reasons from asserting the validity of its private leases. We address these arguments in turn.

## B. Collateral Attack

The Barlows and the United States contend that Munson's attempt to assert its rights under the private leases is an impermissible collateral attack on the validity of the settlement agreements. They assert Munson knew of the ongoing settlement negotiations, chose not to participate in them, and thereby waived its rights, much as those who chose not to participate in the original Tosco litigation did by failing to timely intervene in that case. Tosco Corp. v. Hodel, 804 F.2d

590, 592 (10th Cir. 1986).  Moreover, the United States claims Munson's attack on the validity of the settlements contravenes the power of the attorney general to settle litigation in whatever manner he considers efficacious.  We disagree with both of these propositions.

Munson is attempting to enforce the legal effect of the instruments of title executed pursuant to the settlement agreements.  As we have concluded, the normal effect of these instruments would be to validate Munson's rights.  Munson's assertion of its rights in this proceeding, rather than in the settlement negotiations, would constitute an impermissible collateral attack only if Munson-- despite being a nonsignatory--is by reason of his conduct bound by the terms of the *settlement agreements* themselves, rather than by the instruments of conveyance.  We conclude, infra part C, that it is not so bound.

Nor does this case derogate the right of the federal government to settle litigation.  The government chose to settle the oil shale litigation by issuing patents.  The patents were instruments of title with a particular legal significance, which would ordinarily conclusively determine the priority of Munson's private leases despite the agreement of the Ertls and Marathon to the contrary.  The attorney general's power to settle litigation does not allow the United States to avoid the legal effect of the documents executed pursuant to its chosen manner of settlement.  The government and the Barlows could have secured the result they

now seek by requiring that Munson assign its private leases back to the Ertls and to Marathon prior to the execution of the settlement agreements.

**C. Munson's Conduct**

The Barlows contend Munson's conduct, evidenced in written letters, memoranda and contracts, indicates Munson's intention to be bound by all the terms and conditions of the United States/Ertl Settlement Agreement. These documents, they assert, estop Munson from claiming the validity of the private leases by operation of ordinary principles of mining law, or constitute waiver of its rights thereunder. When reviewing this evidence, the district court focused on whether the documents support the conclusion that Munson knew of the ongoing settlement negotiations. We agree the documents do support such an inference. We disagree, however, that the documents reveal the expression by Munson of any intent regarding the relevant question: whether Munson intended to give up its right to assert the priority of the private leases should the settlements result in their validation. We consider each type of documentary evidence in turn.

1. Letters/Memoranda

a. Pre-Lease Negotiation Letters

Before Munson acquired either private or federal leases, it entered into negotiations with Ertl for acquisition of the right to drill and produce oil and gas

on land subject to the Ertl oil shale claims. In the first of those negotiation letters, Munson expressed a desire to "be a neutral party to any claims between [Ertl] and the United States," and it proposed leasing acreage from Ertl "[t]he primary term [of which] would not start until . . . [the Ertl] claims for patent had issued as to the oil and gas minerals on these lands." Rec., vol. I at 261. The second negotiation letter indicated Munson understood Ertl was willing to agree either that it would "not claim[] the oil and gas rights or that it would lease [Munson] the oil and gas rights." Id. at 264. The third negotiation letter contained a counter-offer which proposed the lease arrangement ultimately agreed to: a private lease to run parallel with any future-acquired federal leases. Id. at 265. In that letter, Munson stated its belief that such a lease arrangement "would perhaps reinforce [the Ertl] title position." Id. at 266

These letters represent preliminary negotiations regarding the issuance of oil and gas leases on the Ertl oil shale claims. They do not reflect the final agreement reached between the parties. It is the lease agreement itself which embodies the full agreement between the parties, and that document shows that Munson and Ertl ultimately rejected the previously discussed options and resolved matters through execution of an oil and gas lease giving Munson legally protected interests in the Ertl oil shale claims. Even if the negotiation letters were relevant,

they express no intent by Munson to compromise its ability to assert the validity of its private leases.

### b. Memoranda to Munson's Ertl Lease File

In 1985, Munson inserted a memorandum in its Ertl lease file from which it is evident that Munson understood the government wanted to trade oil shale for oil and gas rights, and that Ertl contemplated assigning the government a substantial portion of the oil and gas royalty to secure title to the oil shale. Another similar memorandum indicates that *if* title is resolved in favor of the government, Munson will need to pay royalties presently held in suspense. Although these documents indicate Munson's general awareness of the Ertl position on securing oil shale title, they do not indicate that Munson would fail to assert the validity of its private leases, should title be resolved in a way that preserved those leases.

### 2. The Unit Operating Agreement

In 1978, prior to establishing production on the leases, Munson signed a Unit Operating Agreement (UOA). The Barlows ascribe particular significance to a clause in the UOA permitting Munson to suspend royalty payments in the event of a title dispute.[3] They suggest, and the district court agreed, rec., vol. II at 737,

---

[3]The relevant portion of the unit operating agreement says: "In the event of a dispute as to title as to any royalty . . . payment or delivery on account thereof may be withheld without liability for interest until the dispute is finally settled . .

that this clause demonstrates Munson's affirmative intent to be bound by the contractual terms of the United States/Ertl or the United States/Marathon "settlements," and by an "Agreement Not To Contest," discussed infra, rather than by the instruments of title executed pursuant to the settlement agreements.

First, we note that the unit operating agreement is a standard form unit agreement imposed by the federal government. 2 LAW OF FEDERAL OIL AND GAS LEASES § 18.02[2]. As part of the standardized form, the clause in question holds no particular significance for the oil shale disputes; rather, it is inserted in federal forms to direct payment of royalties in the event of title disputes. It is not used to prescribe the manner by which the operator of the unit may become bound to settlements.

Second, the unit agreement was signed by Munson on June 28, 1978, well before the "Agreement Not To Contest" was signed with Ertl. It therefore cannot inform us regarding ambiguities which may exist in a document executed three years later.

Finally, the language employed in the unit agreement says only that, in the event of a title dispute, the unit operator may withhold payments of royalties to any entity, other than the federal government, until such time as the dispute over

_____

. ." Rec., vol. I at 126.

who should be paid is resolved. The UOA refers to a dispute regarding proper recipients of royalties. The Barlow/Munson dispute before the court is precisely such a dispute, and it has not been settled. The UOA does not itself provide a basis upon which the settlements between the United States and Ertl and Marathon must be considered as having "settled" the Barlow/Munson dispute; the UOA merely provides that *if* the Barlow/Munson dispute is deemed settled by the Ertl and Marathon settlements, Munson must pay royalties. The unit operating dispute will not be settled until the present case is settled. The UOA in no way prevents Munson from contesting its obligation to pay royalty payments to the Barlows.

3. Munson/Ertl Agreement Not To Contest

The Barlows have identified one last document which they say indicates Munson's intent to be bound by the contractual terms of the United States/Ertl settlement agreement. On September 30, 1981, before Ertl settled with the United States and shortly after Munson acquired federal leases by assignment from the Barlows, Munson entered into an "Agreement Not To Contest" with Ertl. In this agreement, Munson promises to neither "initiate, join in, support, defend or in any way become involved in a contest of the Claims or otherwise object to Claim Owner's right to apply for, process and receive patents from the United States of America covering the Land and the Claims." Rec., vol. I at 275. Ertl's rights as a

claim owner is described as entitling it to a right of "exclusive possession of the Land." Id. at 274. This document, in conjunction with the letters and memoranda, and a statement by Munson that it would not seek to intervene in the United States/Ertl settlement agreement because it "did not believe that its property rights would be affected and therefore saw no reason to participate," rec. vol. II at 382, suggest to the Barlows and to the district court that Munson gave up its right to assert the validity of its private leases.

We disagree. Although Munson might have been bound had Ertl acquired title to the oil and gas which did not relate back to the establishment of its mining claim, the language in the agreement does not support an inference that Munson would refrain from asserting the validity of its private leases if Ertl were to receive a standard mining patent.

We conclude that none of the documentary evidence offered by the Barlows supports the contention that Munson gave up its rights to assert the validity of its private leases upon issuance of patents to Ertl and to Marathon. Munson's knowledge of the ongoing Ertl settlement proceedings[4] is simply not relevant to the meaning of the federal patents. The instruments of title ultimately executed pursuant to the agreements validated the private leases and thereby gave Munson

---

[4]There was no evidence submitted to support a contention that Munson was aware of or agreed to be bound by the Marathon settlement negotiations.

-19-

a complete defense to the nonpayment of royalties to the Barlows.

## III.

In sum, we are convinced the evidence does not support an inference that Munson gave up its right to assert the validity of its private leases. The issuance of patents to Ertl and to Marathon fully validates Munson's private leases. Consequently, the district court erred in granting summary judgment to the Barlows.

We **REVERSE** the order of the district court granting the Barlows' motion for summary judgment and **REMAND** for further proceedings to resolve outstanding issues if any remain.