**SPORTSMEN'S WILDLIFE DEFENSE FUND, a non-profit corporation; Western Slope Environmental Resource Council, a non-profit citizens group; Richard Saxton, an individual; and David Huerkamp, an individual, Plaintiffs,**

v.

**Roy ROMER, in his official capacity as the Governor of the State of Colorado; John Mumma, in his official capacity as Director of the Colorado Division of Wildlife; Aristede Zavaras, in his official capacity as Director of the Colorado Department of Corrections United States Fish and Wildlife Service; John Rodgers, in his official capacity as Acting Director of the United States Fish and Wildlife Service; Defendants.**

No. Civ. 97–B–737.

United States District Court,
D. Colorado.

Dec. 11, 1998.

1200

Dawn M. McKnight, Earthlaw, Denver, CO, Colin C. Deihl/Jessica Toll, Faegre & Benson LLP, Denver, CO, for plaintiffs.

Robert D. Clark, Assistant U.S. Attorney, Denver, CO, Thomas R. Graf, U.S. Dept. of the Interior, Lakewood, CO, Timothy J. Monahan, Assistant Attorney General, Natural Resources Section, Denver, CO, John A. Lizza, First Asst. Attorney General, State Services Section, Denver, CO, for defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

In this environmental dispute, plaintiffs, Sportsmen's Wildlife Defense Fund (SWDF), Western Slope Environmental Resource Council (WSERC), Richard Saxton, and D avid Huerkamp (collectively, Plaintiffs) assert claim one pursuant to 42 U.S.C. § 1983 for violation of the Pittman–Robertson Wildlife Restoration Act (P–R Act); 16 U.S.C. § 669 *et seq.* against defendants Roy Romer, in his official capacity as the Governor of the State of Colorado, John Mumma, in his official capacity as Director of the Colorado Division of Wildlife (DOW), Aristede Zavaras, in his official capacity as Director of the Colorado Department of Corrections (DOC) (collectively, State Defendants). Plaintiffs bring claims two and three for violation of the Administrative Procedures Act (APA), 5 U.S.C. §§ 701–706, against defendants United States Fish and Wildlife Service (USFWS) and John Rodgers, in his official capacity as Acting Director of the United States Fish and Wildlife Service (collectively, Federal Defendants). Pursuant to Fed. R.Civ.P. 56 all Defendants move for summary judgment on the claims brought against them. Plaintiffs cross-move for summary judgment. After consideration of the motions, briefs, and counsels' argument, I grant Defendants' motions in part and deny them in part. I deny Plaintiffs' cross-motion for summary judgment.

## I.

### SUMMARY JUDGMENT STANDARD

The very purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir.1995). Fed.R.Civ.P. 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of mate-

rial fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The non-moving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252, 106 S.Ct. 2505; *Mares,* 971 F.2d at 494. Where, as here, the parties file cross motions for summary judgment, I assume that no evidence need be considered other than that filed by the parties. Nevertheless, summary judgment.is inappropriate if disputes remain as to material facts. *James Barlow Family Ltd. Partnership v. David M. Munson, Inc.,* 124 F.3d 1321, 1323 (10th Cir.1997).

## II.

### Background

This action was filed by Plaintiffs to: 1) force the State Defendants to replace the portion of the Escalante State Wildlife Area (Wildlife Area) on which the DOC built a prison facility located near Delta, Colorado (Delta prison); and 2) prevent future misuses of state wildlife areas. Pltf. S.J. Cross-motion, p. 1.

In 1955, the State of Colorado proposed the creation of the Wildlife Area located on the eastern flank of the Uncompahgre Plateau in Delta and Montrose Counties in western Colorado. The Wildlife Area, comprised of 10 separate tracts of land totaling more than 7,000 acres, is scattered along the Gun-

nison River, and its two main western tributaries, Escalante and Roubideau Creeks. It consists of nearly 200 square miles of desert and forest acquired over a 20 year period. *See* Wildlife Area Map, Ex. 3.

The Delta prison, originally known as the Delta Honor Camp, was built in the mid–1960's on approximately 80 acres of the 2,480 acre Lower Roubideau Tract of the Wildlife Area, the largest of the Wildlife Area's 10 tracts. Situated five miles west of Delta, Colorado, at the confluence of Roubideau Creek and the Gunnison River, the Delta prison, currently known as the Delta Correctional Center, functions as a minimum security correctional facility. *Id.*

In 1994, the SWDF initiated an inquiry into how a prison came to be located in a state wildlife area. Pltfs. S.J. Cross–Motion, p. 2. As a result, the State of Colorado entered into certain agreements with the State and Federal defendants to avoid or remedy any possible improprieties. Unsatisfied with the Defendants' actions, Plaintiffs filed suit in 1997 claiming that the State Defendants are violating the P–R Act and the Federal Defendants have violated the APA by allowing them to continue to violate the P–R Act.

### III.

#### A. *The Property At Issue*

This case involves the following parcels of land within the Lower Roubideau Tract of the Wildlife Area:

1. *82.74 acres (82.74 acre tract or prison compound)*

This tract is located in the southeast corner of the Lower Roubideau Tract where the DOC has constructed the Delta prison. Detail Map of Prison Compound, Ex. 9.
   *Funding:* The parties disagree whether the money to purchase this property came from federal aid monies or license fee monies.

2. *13.5 acres (13.5 acre tract)*

This tract is located directly north of the prison compound at the confluence of Cottonwood and Roubideau Creeks. *See* Detail Map, Ex. 9. This land was fenced by DOC from 1964 through 1996. Apparent-

ly, DOC plans to continue to use the 13.5 acre tract for certain purposes including "ingress and egress to DOC, for placement of signs, and for placement of security devices." Def's. Response to Pltfs. First Request for Admission, Admission No. 1, Ex. 10.
   *Funding:* The parties agree that this parcel was purchased with federal aid monies.

3. *31 acres (31 acre tract)*

This tract is located directly south of the prison compound along the west bank of Roubideau Creek. Pltfs. Ex. 9. DOC acquired the 31 acre tract from DOW. *See* Pltf. Ex. 11.
   *Funding:* The parties disagree whether the funds to acquire this property came from federal aid monies or license fee monies.

4. *Buffer zone around the prison (buffer zone)*

   *Funding:* The parties disagree about the source of the funds used to purchase this property, although they agree that some portion of the buffer zone was acquired with federal aid monies.

5. *Paved access road and bridge (access road)*

DOC constructed, or caused to be constructed, a paved access road to the prison which crosses the Lower Roubideau Tract and includes a bridge over Cottonwood Creek. Pltfs. Ex. 9. The access road was historically owned in fee simple by DOW. Recently, DOW transferred to Delta County, Colorado, a non-exclusive right-of-way to the access road. Pltfs. Ex. 35.
   *Funding:* The parties agree that this property was originally purchased with federal aid monies.

The crux of this case, assuming there have been violations of the P–R Act, is:

1. whether federal monies or state license monies were used to purchase the pertinent property;

2. whether the State Defendants have a right to cure the violations and, if so;

3. what actions are required to cure any violations depending on whether there was a "diversion" of state license monies or a "misuse" of federal monies.

Each of these questions is resolved with reference to the P–R Act.

## B. *Pittman–Robertson Act, 16 U.S.C. § 669, et seq.*

The P–R Act provides in part:

[t]he Secretary of the Interior is authorized to cooperate with the States, through their respective State fish and game departments, in wildlife-restoration projects ...; but no money apportioned under this chapter to any State shall be expended ... until [the State] shall have assented to the provision (sic) of this chapter and shall have passed laws ... which shall include a prohibition against the diversion of license fees paid by hunters for any other purpose than the administration of said State fish and game department.... The Secretary of the Interior and the State fish and game department of each State accepting the benefits of this chapter, shall agree upon the wildlife-restoration projects to be aided in such State under the terms of this chapter....

16 U.S.C. § 669. Thus, the P–R Act provides federal matching grants to states for wildlife restoration projects funded jointly by a state and the USFWS. To qualify for federal matching funds, commonly referred to as "federal aid monies" or "P–R monies," a recipient state must agree to use its state hunting license fees solely for wildlife purposes. 16 U.S.C. § 669. The P–R Act further requires the state to enact legislation making it unlawful for the state to use its own license fee monies for any purpose other than wildlife.

P–R Act federal aid monies can be used only for wildlife restoration projects defined to mean:

[t]he selection, restoration, rehabilitation, and improvement of areas of land or water adaptable as feeding, resting, or breeding places for wildlife, including acquisition by *purchase,* condemnation, lease, or gift of such areas or estates or interests therein as are suitable or capable of being made suitable therefore, and the *construction thereon or therein of such works as may*

*be necessary to make them available for such purposes.*

16 U.S.C. § 669a (emphasis added).

■ The P–R Act further restricts how state license fee revenues can be spent. The term "license revenues" is defined to include income from the "sale, lease, rental, or other granting of rights of real or personal property acquired or produced with license fee revenues." 50 C.F.R. § 80.4(a)(2). A state, like Colorado, that has assented to the P–R Act's terms may use its license fee monies only for the administration of its fish and game department. *See* § 669; 50 C.F.R. § 80.14. Thus, the P–R Act places mandatory restrictions on a recipient state's use of its own state monies and state wildlife areas for non-wildlife purposes such as highways, prisons, or schools.

■ Pursuant to 16 U.S.C. § 669i, the Secretary of the Interior has promulgated rules and regulations for carrying out the P–R Act's provisions. *See generally* 50 C.F.R. part 80. These regulations treat real property in the same manner, whether acquired or constructed with federal aid monies. Consequently, just as a state cannot spend matching federal aid monies on a non-approved project, a state cannot use real property acquired with federal aid monies for any purpose other than that previously approved by the USFWS. According to the regulations, real property acquired or constructed with federal aid funds must continue to serve the purpose for which it was acquired or constructed. *See* § 80.14(b). Therefore, if a state purchases real property for use as a wildlife area with any federal aid monies, the property must continue to be used as a wildlife area.

The regulations also restrict a state's use of real property acquired with state license fee monies. As discussed above, the regulations secure this restriction by defining the term "license fee revenue" broadly to include income from the sale, lease, or other granting of rights in real property acquired with license revenues. *See* § 80.4(a)(2).

■ If a state uses land acquired with federal aid monies for a non-approved purpose, the state is considered to have "mis-

used" the federal aid monies, pursuant to § 80.14. If a state spends license fee monies on a non-approved purpose or uses land acquired with license fee monies for a non-approved purpose, the state is said to have "diverted" those license fee monies pursuant to § 80.4. The regulations contain explicit, separate remedies for "diversion" or "misuse." This distinction is important in this case.

### 1. *Diversion*

"A diversion of state license fee revenues occurs when any portion of license revenues is used for any purpose other than the administration of the State fish and wildlife agency." 50 CFR § 80.4(c). If a diversion occurs, the state becomes ineligible to participate under the ... Act from the date the diversion is declared by the Director until:

1.  adequate legislative prohibitions are in place to prevent diversion of license revenue, and;

2.  all license revenues or assets acquired with license revenues are restored, or an amount equal to license revenue diverted or current market value of assets diverted (whichever is greater) is returned and properly available for use for the administration of the State fish and wildlife agency.

*See* 50 C.F.R. § 80.4(d)(2).

### 2. *Misuse*

"Misuse" of federal aid monies occurs when such funds are not " applied only to activities or purposes approved by the regional director. If otherwise applied, such funds must be replaced or the State becomes ineligible to participate." 50 CFR § 80.14(a). Section 80.14 provides further:

(b) real property acquired or constructed with Federal Aid funds must continue to serve the purpose for which it was acquired or constructed.

(1) When such property passes from management control of the fish and wildlife agency, the control must be fully restored to the State fish and wildlife agency *or* the real property must be replaced using non-Federal funds. Replacement property must be of equal value at current market prices and with equal benefits as the original property. The State may have a rea-

sonable time, up to three years from the date of notification by the regional director, to acquire replacement property before becoming ineligible.

(2) When such property is used for purposes which interfere with the accomplishment of approved purposes, the violating activities must cease and any adverse effects resulting must be remedied....

50 CFR § 80.14 (emphasis added). To establish misuse of federal aid monies requires proof that either: 1) P–R Act funds were used to acquire the land in question; or 2) the property was constructed or maintained with P–R Act funds.

### C. *Acquisition of the Escalante State Wildlife Area*

On October 20, 1955, the State of Colorado submitted a financing request, "Project W–92–L" titled "Federal Aid in Fish and Wildlife Restoration Preliminary Project Statement Fish and/or Land Acquisition Project" to the United States Department of Interior (the Project). Pltfs. Ex. 4. In the Project, Colorado proposed creating the Escalante State Wildlife Area by buying two large cattle ranches owned by the Huffington and Lockhart families. *Id.* In compliance with the regulations in effect in 1955, the USFWS and the Secretary of Interior reviewed the project statement to determine if the Project was "substantial in character and design" and therefore suitable for federal aid. *See* 16 U.S.C. § 669e(a)(2); 50 C.F.R. § 41.21 (1955); Pltf. Ex. 13. In November 1955, the USFWS and the Secretary of the Interior approved the Project including the acquisition of all the land at issue in this case. Pltf. Ex. 4, p. 10. In December 1955, the USFWS prepared a federal aid appraisal report describing and appraising the entire Lockhart Ranch as a federal aid tract.

Upon approval of the Project, Colorado entered into negotiations with the Huffingtons and the Lockharts to purchase their ranches. For tax reasons, the owners requested that they receive payments for their land over three years. Pltfs. Ex. 15, at 1–2. On November 1, 1956, Colorado and the Lockharts entered into an "Option to Purchase" in which the state agreed to purchase

"Tract One" of the Lockhart Ranch in 1957 and Tracts Two and Three thereafter. *Id.*

Although the State of Colorado made the first payment to Lockhart in 1957, for reasons unknown, it waited almost two years before submitting its project plans, specifications and estimates, required by 16 U.S.C. § 669e(a)(2) to obtain federal aid reimbursement. In October 1958, after the state had made two of three scheduled payments to the Lockharts, DOW submitted its plans, specifications, and estimates for the Project to USFWS for approval requesting reimbursement for the entire Lockhart ranch. Pltf. Ex. 17.

On November 21, 1958, the Secretary of the Interior conditionally approved the plans, specifications and estimates for the Project, but denied federal aid reimbursement for Lockhart Tract I because the state had delayed making its reimbursement request for more than a year, and federal aid reimbursement funds were no longer available for expenditures made in 1957. *See* Pltf. Ex. 18. The USFWS reimbursed Colorado for the second two payments to the Lockharts.

Based on these undisputed facts, the State Defendants contend that no P–R Act funds were used to acquire the portion of the Lower Roubideau Tract where the Delta prison is located. As to the 82.74 acre tract, the State Defendants submit the affidavit of Mary Gessner, USFWS assistant regional director for federal aid stating that "based on [her] review of the [USFWS] files and [her] personal knowledge of the facts of this case:

1. The Delta Correctional Center occupies approximately 80 acres of the Lower Roubideau Tract of the Escalante State Wildlife Area;

2. None of the 80 acres was purchased with federal aid monies; and

3. Some parcels within the Lower Roubideau Tract of the Escalante State Wildlife Area were purchased with federal aid funds provided to DOW by USFWS under the P–R Act.

USFWS S.J. Mtn., Ex. B, ¶¶ 1–3. Likewise, Robert Towry, Habitat Section Manager for the DOW, testified that he has no knowledge that federal aid monies were used to purchase the 31 acre tract directly south of the prison. Pltf. Ex. 26, pp. 48–49.

Plaintiffs, who do not genuinely dispute Gessner's affidavit or Towry's testimony, nevertheless argue that because a *portion* of the Lockhart Ranch was purchased using federal aid monies, I should hold that for purposes of the P–R Act, the *entire* Lockhart Ranch was paid for with P–R Act funds. I disagree.

The "cardinal canon" of statutory construction is that "courts must presume that the legislature says in the statute what it means and means in the statute what is says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). I further presume that Congress is aware of other existing law when it passes legislation. *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990).

The P–R Act and its associated regulations, 50 C.F.R. §§ 80.4 and 80.14, contain no explicit language supporting Plaintiffs' fictive view or any language which could be construed to reach the result urged by Plaintiffs. I find and conclude that there is no genuine dispute that the 82.74 acre and the 31 acre tracts containing the Delta prison were not purchased with federal aid monies. Accordingly, I hold as a matter of law that as to these tracts there is no "misuse" of federal aid monies pursuant to § 80.14.

1. *Federal Aid Development of Lower Roubideau Tract*

Plaintiffs may also establish a P–R Act violation by showing that P–R Act monies were used to develop and maintain land subject to the P–R Act which is being used for a purpose other than for wildlife. Thus, Plaintiffs argue that even if the property transferred to the DOC was not "acquired with federal funds," it was "constructed with federal funds" which constitutes a "misuse" pursuant to § 80.14(b). Again, I disagree.

It is undisputed that even before the purchase of the Lockhart and Huffington Ranches was completed, Colorado incorporated the newly created Escalante State Wildlife Area into its annual statewide Federal Aid Fish and Wildlife Habitat Improvement Project, Project FW–6–D. White Affidavit, Ex. 7, 11. Also, between 1958 and

1964, all wildlife development activities on the Lockhart Ranch were done using federal aid monies under Project FW–6–D. According to Claude E. White, former land manager of DOW's Southwest Region, Project FW–6–D used federal aid monies to construct improvements on the Lockhart Ranch. *See* White Affidavit, Ex. 7. This was accomplished pursuant to the original management plan for the Wildlife Area, including the entire Lockhart Ranch. *Id.* at ¶¶ 2–3. Also, all wildlife development on the Lockhart Ranch from 1958 through 1964 was conducted with federal aid monies. *Id.* Federal aid monies were used in the Lower Roubideau Tract, including land currently part of the Prison Compound to:

1. hire seasonal labor who constructed and maintained fences and an irrigation system;

2. purchase fencing materials for use on the Lower Roubideau Tract, including land currently part of the Prison Compound; and

3. plant lure crops for wildlife on lands that later became part of the Prison Compound.

*Id.*

Plaintiffs cite to Ex. 17 to support their contention that Colorado continued to apply for federal aid funds to develop the Lower Roubideau Tract after 1964. However, Ex. 17 is undated and contains no indication that federal aid monies applied for were obtained.

■ Assuming *arguendo*, that P–R Act funds were spent on the 82.74 acre or the 31 acre tract to construct and maintain fences, construct and maintain irrigation ditches, and plant annual wildlife food plots, the Defendants contend that these expenditures are insufficient to constitute "misuse" pursuant to § 80.14(b)(1). I agree.

According to Defendants, the term "constructed" in the phrase "real property acquired or constructed with federal aid funds" contained in § 80.14(b)(1) refers to expensive major structures with long useful lives, such as buildings. Section 80.17 suggests that the term "constructed" applies only to capital improvements, and that less substantial and less permanent improvements are not covered by the term "constructed." 50 C.F.R. § 80.17 provides:

> The State is responsible for maintenance of all capital improvements acquired or constructed with Federal Aid funds throughout the useful life of each such improvement.

50 C.F.R. § 80.17. The State bears no such responsibility where the improvement is something less than a "capital improvement." 50 C.F.R. § 80.17 provides further that the useful life of the improvement determines whether the improvement is a "capital improvement." Once the useful life of the improvement has expired, the P–R Act restrictions on use of the improvement also expire. 50 C.F.R. § 80.17.

■ 50 C.F.R. § 80.20 provides that "[t]he State must control lands or waters on which capital improvements are made with Federal Aid funds." There is no such state control requirement where improvements do not rise to the level of "capital improvements." I conclude that the term "constructed" in § 80.14(b)(1) does not include expenditures for construction, operation, and maintenance of the fencing, earthen irrigation ditches, or wildlife food plots. The expenditures encompassed by the term "constructed" are similar in permanence and magnitude to the acquisition of land, the other word that appears in the phrase "real property acquired or constructed with Federal funds" in § 80.14(b)(1). In any event, Plaintiffs rely on expenditures made between 1958 and 1964 for the: 1) construction and maintenance of irrigation ditches, fences and corrals; and 2) planting alfalfa, barley and other wildlife food fields. *See* Pltf. Ex. 7, White Affidavit, *passim*. Even if these activities could be viewed as "construction," pursuant to § 80.17, after more than 30 years, I conclude, as a matter of law, that any "useful life" of these improvements has expired. *See id.* Consequently, the 82.74 acre and 31 acre tracts were not "real property ... constructed with Federal funds" so as to constitute "misuse" of Federal Aid monies pursuant to § 80.14(b).

■ Instead, pursuant to § 80.4, a "diversion" of state license fee monies occurred in connection with the 82.74 acre and the 31 acre tracts comprising the prison compound. I turn then to the actions taken by State

Defendants to remedy or "cure" this diversion.

### D. *Right to "cure"*

As an initial matter, Defendants argue that the State Defendants have a right to cure any diversion or misuse. Although Plaintiffs take exception to the sufficiency of the actions to cure, they agree that the pertinent regulations allow a cure. Pltf. S.J. Cross–Motion, pp. 7–8. However, Plaintiffs argue that a diversion cure pursuant to § 80.4(d)(2) is permissible only if the circumstances leading to the "diversion" are unintentional or accidental. *Id.* at pp. 6–7. I disagree.

Section 80.14(b) provides expressly for a cure of misuse of federal aid monies:

(1) When such property passes from management control of the fish and wildlife agency, the control must be fully restored to the State fish and wildlife agency *or* the real property must be replaced using non-Federal funds. Replacement property must be of equal value at current market prices and with equal benefits as the original property. *The State may have a reasonable time, up to three years from the date of notification by the regional director, to acquire replacement property before becoming ineligible.*

50 C.F.R. § 80.14(b)(1) (emphasis added).

Section 80.4(d)(2), pertaining to diversions of state licence fee revenues, provides:

"If a diversion of license revenues occurs, the State becomes ineligible to participate under the pertinent Act from the date the diversion is declared by the Director [of USFWS] *until:*

All license revenues or assets acquired with license revenues are restored, or an amount equal to license revenue diverted or current market value of assets diverted (whichever is greater) is returned and properly available for use for the administration of the State fish and wildlife agency."

50 C.F.R. § 80.4(d)(2) (emphasis added).

■ Under the unambiguous language in these regulations, the state has an absolute right to cure a diversion or a misuse. To hold here that there is no right to cure a diversion could render a state perpetually ineligible to receive federal aid funds under

the P–R Act, a result which Congress could not have intended. Accordingly, I conclude that Colorado has the right to cure: 1) any diversion pursuant to § 80.4 after a declaration of diversion; and 2) any misuse pursuant to § 80.14 within three years of notification. Furthermore, § 80.4 contains no requirement that the state's right to cure a diversion or, for that matter a misuse under § 80.14, be limited to unintentional or accidental diversions. Here, there has been neither a declaration of diversion nor notice of misuse, pursuant to these regulations.

### E. *Sufficiency of "cure"*

In early 1995, the USFWS informed the DOW it had determined there was a diversion of assets in connection with the use of the 82.74 acre tract of the Escalante State Wildlife Area as the site for the Delta prison. *See* Ex. 21, ¶ 21. In response, on February 28, 1995, the USFWS entered into a Memorandum of Agreement ("MOA") pursuant to which USFWS agreed not to declare Colorado in diversion under the P–R Act in exchange for DOW's agreement to "evaluate all potentially feasible options, select an action plan, and complete implementation by March 1, 1996, in compliance with 50 C.F.R. § 80.4(d)(2) and 50 C.F.R. § 80.14(b)(1) and (b)(2)." Memorandum of Understanding, Pltf. Ex. 29.

According to Plaintiffs, on March 1, 1996, DOC continued to use all the parcels at issue in this case and no monies had been transferred to DOW. Yet, USFWS still did not declare Colorado in diversion. However, on March 1, 1996, DOC, DOW and the Colorado Division of Parks and Outdoor Recreation entered into a Memorandum of Understanding (MOU) pursuant to which the DOW agreed to transfer to the DOC the prison compound, along with a number of additional parcels and associated water rights. Ex. 29, MOU ¶ 5.

Pursuant to the terms of the MOU, on or about June 18, 1996, DOC transferred $60,287.44 for the use of the DOW, and DOW quit-claimed the 82.74 acre tract and associated water rights to the DOC. Quit Claim Deed. Pltfs. Ex, 30. On March 31, 1998, DOW also quit-claimed the 31 acre tract to

the DOC for $29,500.00. State Def. Ex. H. The parties agree that the 82.74 acre and 31 acre tracts may be treated similarly for purposes of these motions.

Defendants contend that all violations of the P–R Act at the Escalante State Wildlife Area have been cured. Plaintiffs respond that the sale price for the two tracts is "substantially less" than their current market value. Further, Plaintiffs contend that the Defendants have ignored the DOC's use of the 13.5 acre tract, the access road, and the buffer zone and, thus, there has been no cure with respect to these properties.

Plaintiffs argue further that no cure is possible because § 33–1–117, C.R.S., enacted by Colorado to comply with the P–R Act requirements, is not in compliance with 50 C.F.R. § 80.4's provision that "adequate legislative prohibitions [must be] in place to prevent diversion of license revenue" before a state declared to be in diversion is eligible to resume participation in the P–R Act. 50 C.F.R. § 80.4(d)(1). Thus, according to Plaintiffs, any § 80.4 cure cannot be effective until Colorado enacts a statute containing a specific prohibition of diversion of license revenues. I am not persuaded.

Section 33–1–117, C.R.S. titled "Assent of state to Pittman–Robertson act," provides:

> The state of Colorado through the division assents to the provisions of the act of congress entitled "An Act to provide that the United States shall aid the states in wildlife restoration projects, and for other purposes...." The division is authorized to perform such acts as may be necessary to conduct and establish cooperative wildlife restoration projects, as defined in such act, in compliance with such act and the rules and regulations promulgated by the secretary of the interior thereunder. *No moneys or funds accruing to the division pursuant to such act shall be used for any purpose other than for such projects* and the administration of the division....

Section 33–1–117, C.R.S. (emphasis added). According to the State Defendants, there is no substantive problem with § 33–1–117.

The parties provide no authority for their respective positions. However, the plain language of the statute requires the DOW to act "in compliance with the [P–R Act] and the rules and regulations promulgated by the secretary of the interior thereunder." *Id.* The provision thus incorporates by reference all statutory and regulatory requirements of the P–R Act. To require Colorado to include all possible violations of the P–R Act and its supporting rules and regulations would encourage "legislative loopholes." And, in this case, any P–R violation was a result of the DOW's actions in managing the property rather than the broad language of § 33–1–117.

### 1. *82.74 acre tract*

Plaintiffs submit the appraisal of its MAI appraiser showing a fair market value of the prison compound at more than $270,-000. Pltf. Ex. 36, p. 6. Under these circumstances, there is a genuine factual dispute about the sufficiency of the price paid by DOC to DOW for the 82.74 acre tract to cure the diversion.

### 2. *31 acre tract*

On March 31, 1998, pursuant to the MOU, DOW quitclaimed to DOC the 31 acre tract south of the prison compound for $29,500.00. USFWS Ex. A., Towry Aff. ¶ 2. Defendants agree that there is a material factual issue as to the fair market value of this tract and, thus, the sufficiency of the price paid by DOC to DOW for the 31 acre tract to cure the diversion.

I deny the motion and cross-motion for summary judgment on claim one as to the sufficiency of the cure for the 82.74 acre and 31 acre tracts.

### 3. *Access road*

The parties agree that §§ 80.4 and 80.14 apply to the analysis of the access road linking the Prison Compound to County Road G because it crosses land purchased with federal funds and state license revenues. Plaintiffs argue that DOW transferred title to the access road to Delta County, Colorado. However, according to the plain language of Plaintiffs' Ex. M, in January 1998, the DOW granted Delta County, Colorado a non-exclusive right-of-way to operate and maintain the road rather than transferring fee title to it. Pltf. Ex. M.

Plaintiffs complain that the transfer occurred without: 1) exchange of consideration; 2) approval of the Director of the USFWS as required by the P–R Act; and 3) replacement of the property as required by § 80.14.

### a. Consideration

It is axiomatic that forms of consideration other than money are valid. *See e.g. Gertner v. Limon Nat'l Bank*, 82 Colo. 13, 257 P. 247 (1927); *Vote v. Karrick*, 13 Colo. App. 388, 391, 58 P. 333, 334 (1899). Valid consideration may consist of a benefit to the promisor, or a detriment or disadvantage to the promisee. *Dyer v. McPhee*, 6 Colo. 174 (1882).

The grant provides that "the [DOW], for and in consideration of the mutual covenants and agreements hereinafter expressed ..., the sufficiency of which is hereby acknowledged, does ... grant and convey a non-exclusive Right–of–Way to [Delta County, Colorado]." Pltf. Ex. M, p. 1. Further, "in consideration of the Right-of Way grant, [Delta County, Colorado] shall construct and maintain at no cost to the [DOW] ... the country roads as they cross land owned by [DOW] ... [Delta County, Colorado] shall be required to reseed any areas which are disturbed ... and will also be required to replace any fence that is removed...." *Id.* Pursuant to this language, I conclude as a matter of law that there was sufficient consideration to support the transaction.

Having determined that no transfer of fee title occurred, Plaintiffs' complaints that the State Defendants were required to obtain approval of the USFWS Director and to replace the property are without merit. I grant State Defendants' summary judgment motion and deny Plaintiffs' cross-motion on claim one as to the access road.

### 4. 13.5 acre tract

The 13.5 acre tract is located directly north of the Prison Compound at the confluence of Cottonwood and Roubideau Creeks. *See* Detail Map, Ex. 9. It is undisputed that: 1) the 13.5 acre tract was purchased with federal aid monies; and 2) the State Defendants violated the P–R Act in its use of the 13.5 acre tract. Thus, pursuant to

§ 80.14, there has been a misuse of federal aid monies.

In an attempt to cure its misuse, pursuant to § 80.14(b)(1), DOC restored this parcel to DOW's control. Plaintiffs respond that the P–R Act not only requires that the property be restored to DOW's control, but the property must "continue to serve the purpose for which it was acquired or constructed." *Id.* I agree.

It is undisputed that the 13.5 acre tract was originally acquired to serve as winter range for deer, to provide water fowl resting area, and to provide hunting opportunities. *See* Pltf. Cross–Motion Ex. 4, Project Statement. DOC admits, however, that it "intends to use the land for ingress [to] and egress [from] the [Delta Prison], for placement of signs, and for placement of security devices." Pltf. S.J. Cross–Motion, Ex. 10, p. 3. In addition, Plaintiffs present evidence that SWDF members have been stopped by prison guards while attempting to use the tract. *See e.g.* Pltf. Ex. 42, Hinchman Aff. In opposition, State Defendants present evidence that the "13.5 acre parcel is available for use by wildlife and members of the general public." State Def. Ex. K, Robert K. Towry Aff., ¶ 1. Thus, there is a genuine factual dispute whether the 13.5 acre tract "continues to serve the purpose for which it was acquired...." 50 C.F.R. § 80.14(b). Before there can be a determination of the sufficiency of the cure, at trial, I must resolve this factual dispute. Consequently, I deny the parties' summary judgment motions on claim one as to the 13.5 acre tract.

### 5. Buffer Zone

The fourth parcel at issue is a buffer zone extending 1000 feet in all directions from the boundary of the prison compound. According to the Defendants, this land was acquired with state license fees and with federal aid monies but the record does not reflect whether these monies were pooled or used separately to acquire definable portions of the buffer zone. Plaintiffs do not address the source of funds used to acquire this land. Because the consequences of a misuse or a diversion differ, evaluation of the sufficiency of an asserted "cure" is premature. At trial,

I must determine how and which funds were used to acquire the buffer zone. I can then apply the proper cure provision to evaluate the sufficiency of any asserted cure. Moreover, assuming pooled funds were used to acquire the buffer zone, the parties have not adequately briefed the effect pooling has on remedy and cure.

Also, there is a factual dispute about whether this land has been rendered useless for wildlife purposes by the presence of the Delta Prison. *See* Pltf. Ex. 12, Boyle Report, ¶¶ 3, 5, and 6. In direct contradiction to Boyle's report, DOW wildlife biologist John Ellenberger states that "the area immediately surrounding the [Delta prison] is available for use by members of the general public for wildlife related recreational activities such as wildlife viewing, small game and waterfowl hunting, and big game hunting." Def. Ex. O, p. 1. Under these circumstances, I deny the parties' summary judgment motions on claim one as to the buffer zone.

## IV.

### A. *Federal Defendants' Summary Judgment Motion and Plaintiffs' Cross–Motion*

The USFWS moves for summary judgment on Plaintiffs' claim two that it violated the APA by failing to enforce 50 C.F.R. § 80.4 against the State Defendants and claim three for violating the APA by failing to enforce § 80.14. Plaintiffs cross-move for summary judgment on these claims.

The following undisputed facts form the basis of the parties' motions: 1) placing and operating a prison on the 82.74 acre and the 31 acre tracts constituted a diversion pursuant to § 80.4; 2) the USFWS did not cease paying P–R Act federal aid funds to the State; 3) the USFWS has never officially declared Colorado to be in diversion; and 4) Colorado misused federal aid funds in its use of the 13.5 acre tract.

According to Plaintiffs, under these facts, pursuant to § 80.4, the USFWS was required to declare the State of Colorado in diversion and should have cut off federal funding to the state. And, if there was a misuse under § 80.14, the USFWS should have notified Colorado that it was ineligible to participate in federal funding.

In support of its motion, the USFWS states that its decision to delay making a decision whether to declare a diversion or give notice of a misuse under the P–R Act was not arbitrary or capricious pursuant to the Administrative Procedures Act, 5 U.S.C. § 706(2)(A) (APA).

In the Tenth Circuit, the standards applicable to the review of agency action are derived from the APA, not from methods and procedures designed for trial such as Fed. R.Civ.P. 56 summary judgment motions. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1564 (10th Cir.1994) (summary judgment motions are "conceptually incompatible" with a district court's review of agency action under the APA). *See also Baca v. King*, 92 F.3d 1031, 1033 (1996). Thus, Plaintiffs' cross-motion is more properly viewed as an appeal of the USFWS' decision to not declare a diversion or a misuse with respect to Colorado's use of a portion of the Escalante Wildlife Area as prison.

#### 1. *Administrative Procedures Act, 5 U.S.C. §§ 701–706*

Under an APA review of agency action, the district court is required to affirm the final agency action unless that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Roberts v. Morton*, 549 F.2d 158, 160 (10th Cir.1976), *cert. denied*, 434 U.S. 834, 98 S.Ct. 121, 54 L.Ed.2d 95 (1977). When applying subsection (A), I consider whether the decision is based "on a consideration of all relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The APA provides also that in reaching its decision, the reviewing court "shall review the whole record or those parts cited by a party...." 5 U.S.C. § 706. And, "agency action must be examined by scrutinizing the administrative record at the time the agency made its decision." *Asarco, Inc. v. U.S. Environmental Protection Agency*, 616 F.2d 1153, 1159 (9th Cir.1980); *Citizens for Environmental Quality v. U.S.*, 731 F.Supp. 970, 982 (D.Colo. 1989). In reviewing an agency decision, I

may consider other materials as necessary for background information or for determining whether the agency considered all relevant factors including evidence contrary to the agency's position. *See Franklin Savings Ass'n v. Director, Office of Thrift Supervision,* 934 F.2d 1127, 1137 (10th Cir.), *cert. denied,* 503 U.S. 937, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992).

The USFWS may declare a state to be in diversion on account of its use of state license fee revenues if "any portion of license revenues is used for any purpose other than the administration of the State fish and wildlife agency...." 50 C.F.R. § 80.4(c). If a declaration of diversion is made by the USFWS, the entire state is ineligible to receive further P–R Act federal aid funds from the USFWS until the state cures the diversion. 50 C.F.R. § 80.4(d). Also, a diversion declaration is an all or nothing proposition. If the Director of the USFWS declares a state to be in diversion, all future P–R Act federal aid funds are cut off until the diversion is remedied, regardless how much or little state license revenues were used by the state for nonwildlife purposes.

■■■ The Federal Defendants state that under the P–R Act and its supporting regulations, the USFWS's decision whether to declare the State of Colorado in diversion was discretionary. 50 C.F.R. § 80.4(d); 50 C.F.R. § 80.7. I agree.

Section 80.14(d)(2) sets out actions a state must take in order to cure a misuse of federal aid monies. It is silent, however, with respect to the actions the USFWS may or must take in response to the misuse. In contrast, § 80.4(d) provides that if a diversion of state license fee revenues occurs, the state "becomes ineligible to participate under the ... Act from the date the diversion is declared by the [USFWS] Director" until § 80.4(d)(2)'s requirements are fulfilled. The regulation contains no guidance concerning when or if a diversion must be declared. Thus, §§ 80.14 and 80.4 may be interpreted to grant the USFWS broad discretion whether to give notice of misuse or declare a diversion.

In this case, the record before me shows that USFWS reviewed and approved DOW's proposed actions to remedy any violations at the Escalante State Wildlife Area. According to the USFWS, it's choice not to give notice of misuse or declare a diversion facilitated Colorado's actions to cure the improprieties in this case. Thus, it was able to avoid the harsh remedy of cutting off all P–R Act funding to Colorado and placing wildlife at risk. USFWS S.J. Mtn., p. 19.

Upon consideration of all relevant factors, including USFWS' articulated reasons for its decision not to give notice of a misuse or declare a diversion, I cannot state, as a matter of law, that the exercise of discretion by the USFWS here was arbitrary, capricious, an abuse of discretion, or contrary to law. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Therefore, I will grant judgment for the Federal Defendants as a matter of law. *See Biodiversity Legal Foundation v. Babbitt,* 146 F.3d 1249 (10th Cir. 1998); *Olenhouse,* 42 F.3d 1560. I deny Plaintiffs' cross-motion on claims two and three.

V.

CONCLUSION

Pursuant to this Order, the following claims and issues remain for trial:

1. *Claim one against State Defendants*

a. *82.74 acre and 31 acre tracts*

Is the cure of diversion adequate with respect to the fair market value of these tracts?

b. *13.5 acre tract*

Does the 13.5 acre tract continue to serve the purpose for which it was acquired or constructed? If so, State Defendants will prevail. If not, Plaintiffs will be entitled to a cease and desist order and the remediation of any adverse effect resulting from the misuse.

c. *Buffer zone*

What funds were used to acquire this land? Is there either a misuse or diversion of this land? Are cure attempts, if any, adequate?

Accordingly, IT IS ORDERED that:

1. the State Defendants' summary judgment motion is GRANTED as to claim one to the extent it is based on a misuse, pursuant to 50 C.F.R. § 80.14 as to the 82.74 acre and 31 acre tracts;

2. the State Defendants' motion for summary judgment motion on claim one is DENIED as to the adequacy of their cure of a diversion of state license fee revenues in connection with the 82.74 acre and 31 acre tracts;

3. except as otherwise determined in paragraphs 1 and 2 of this Order, plaintiffs' motion for summary judgment as to the 82.74 acre and 31 acre tracts is DENIED;

4. the State Defendants' summary judgment motion on claim one is GRANTED as to the access road. Plaintiffs' summary judgment cross-motion on claim one is DENIED;

5. the summary judgment motions filed by State Defendants and Plaintiffs on claim one are DENIED as to the 13.5 acre tract and the buffer zone;

6. judgment shall enter on behalf of the Federal Defendants and against Plaintiffs on claims two and three;

7. the Federal Defendants are DISMISSED from this case; and

8. Plaintiffs' motion for attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d) and 42 U.S.C. § 1988 is HELD IN ABEYANCE pending trial in this matter.

Further, IT IS DECLARED that:

9. State Defendants diverted license revenues in violation of 50 C.F.R. § 80.4; and

10. pursuant to 50 C.F.R. §§ 80.4 and 80.14, State Defendants have the right to cure diversions and misuses based on violations of these statutes. Dated: December 11, 1998 in Denver, Colorado.