**SPORTSMEN'S WILDLIFE DEFENSE FUND, a nonprofit corporation, Western Slope Environmental Resource Council, a nonprofit citizens group; Richard Saxton, an individual; and David Huerkamp, an individual, Plaintiffs,**

**v.**

**Roy ROMER, in his official capacity as the Governor of the State of Colorado, John Mumma, in his official capacity as Director of the Colorado Division of Wildlife, Aristede Zavaras, in his official capacity as Executive Director of the Colorado Department of Corrections; United States Fish and Wildlife Service, John Rodgers, in his official capacity as Acting Director of the United States Fish and Wildlife Service, Defendants.**

No. Civ.A. 97–B–737.

United States District Court,
D. Colorado.

Nov. 12, 1999.

Colin C. Deihl, Jessica Toll, Faegre & Benson, Denver, CO, Dawn M. McKnight, Earthlaw, Denver, CO, for plaintiffs.

Timothy Monahan, Assistant Attorney General, Denver, CO, John A. Lizza, First Assistant Attorney General, Denver, CO, Thomas R. Graf, U.S. Department of the Interior, Lakewood, CO, Robert Clark, Assistant U.S. Attorney, U.S. Attorney's Office, Denver, CO, for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

BABCOCK, District Judge.

Plaintiffs Sportsmen's Wildlife Defense Fund, Western Slope Environmental Resource Council, Richard Saxton, and David Huerkamp, (collectively, Plaintiffs) assert one claim pursuant to 42 U.S.C. § 1983 for violation of the Pittman–Robertson Wildlife Restoration Act (P–R Act), 16 U.S.C. § 669, *et seq*, against Defendants Roy Romer, in his official capacity as the Governor of the State of Colorado, John Mumma, in his official capacity as Director of the Colorado Division of Wildlife (DOW), and Aristede Zavaras, in his official capacity as Executive Director of the Colorado Department of Corrections (DOC) (collectively, State Defendants). In *Sportsmen's Wildlife Defense Fund v. Romer*, 29 F.Supp.2d 1199 (D.Colo.1998) (Delta I), I granted summary judgment on behalf of the State Defendants on Plaintiffs' claims two and three for violation of the Administrative Procedures Act, 5 U.S.C. §§ 701–706 against defendants United States Fish and Wildlife Service (USFWS) and John Rodgers, in his official capacity as Acting Director of the United States Fish and Wildlife Service (collectively, Federal Defendants). In addition, I declared that the State Defendants violated the Pittman–Robertson Act by diverting license revenues in violation of 50 C.F.R. § 80.4, but had a right to cure that diversion. After trial to the Court concerning the adequacy of the State's cure, and the existence of other alleged misuses and diversions, I now enter the following findings of fact, conclusions of law, and order of judgment regarding Plaintiffs' remaining claim one pursuant to 42 U.S.C. § 1983 against the State Defendants.

I.

In 1955, the State of Colorado proposed the creation of the Escalante State Wildlife Area (Wildlife Area or ESWA) on the eastern flank of the Uncompahgre Plateau in Delta and Montrose Counties in Western Colorado. The State applied to the United States Department of Interior for federal funding of the project pursuant to the P–R Act. The State initially created the Wildlife Area by purchasing two large cattle ranches owned by the Huffington and Lockhart families.

All of the property at issue in this case is located in the Lower Roubideau Tract of the Wildlife Area near the confluence of Cottonwood and Roubideau Creeks. All of the property was purchased between 1957 and 1959. A portion of property was acquired originally with state license fee monies, and the rest with federal aid monies.

The parties stipulate that the entire Wildlife Area was originally purchased to provide habitat for mule deer and associated recreational opportunities for big game hunters, as well as habitat for small game and water fowl and associated wildlife recreational opportunities. Revised Pre-trial Order, Stipulations, p. 5, ¶ 2.

In July 1964, the State's Game, Fish and Parks Commission (the predecessor agency to DOW) leased approximately 90 acres of the ESWA to the Colorado Department of Institutions (the predecessor agency to DOC) for use as a conservation training camp. From 1964 through 1994, the DOC gradually converted the area from a conservation training camp to a minimum se-

curity prison known as the Delta Correctional Center (DCC).

On December 28, 1994, the DOW and the DOC executed: 1) an amendment to the original lease specifying the real property within the Lower Roubideau Tract of the Wildlife Area subject to the lease; and 2) a special use agreement providing additional uses by DOC of real property located within the Lower Roubideau Tract. The lease amendment applied to a 13.5 acre parcel contained within the 90.99 acres of lands subject to the lease and originally purchased with federal funding.

After execution of the lease amendment and the special use agreement, the USFWS, the federal agency responsible for implementing of the P–R Act, questioned the propriety of using property purchased with state hunting and fishing license fee revenues or federal funding for correctional purposes. The USFWS then directed the DOW to resolve the issue in accordance with the requirements of P–R Act or risk loss of future federal funding.

In an attempt to avoid or remedy any possible improprieties under the P–R Act, the State of Colorado entered into certain agreements with the State and Federal Defendants. On March 1, 1996, the DOW and DOC entered into a memorandum of understanding (MOU) in which the DOW agreed to transfer property necessary for the operation of the DCC to the DOC. In exchange, the DOC agreed to pay DOW the appraised value of the transferred property. Further, all other property within the Lower Roubideau Tract of the Wildlife Area that had been used for correctional purposes would be returned to the control and management of the DOW. *See* Ex. A–2. It is undisputed that the DCC operations are located on the 82.74 acre and 31.11 acre parcels transferred to the DOC by the DOW.

On October 19, 1995, DOW contract appraiser Michael Nash, Nash Johnson and Associates, Inc., appraised the 90.99 acres subject to the lease agreement. He concluded that the fair market value of the 90.99 acres was $63,000 or approximately $692 per acre. On May 31, 1996, the DOW transferred 82.74 acres of the 90.99 acre parcel in exchange for DOC's payment of $60,287.44.

On November 6, 1997, the 31.11 acres of real property located immediately south of the DCC was appraised and valued by Stevens Real Estate Services, a DOC contract appraiser at $29,500 or approximately $692 per acre. On March 31, 1998, the DOW transferred the additional 31.11 acres to the DOC for $29,500 paid by DOC. The property transferred had been purchased originally with state hunting and fishing license fee revenues. DOW intends to use the proceeds of the sale of the 82.74 and 31.11 acre parcels to purchase wildlife property. Also, the proceeds are available to the DOW for wildlife purposes. *See* § 80.4.

## II.

### A.  The Property At Issue

Plaintiffs claim that the DOC activities on the following parcels of land within the Lower Roubideau Tract of the Wildlife Area interfered with the accomplishment of the wildlife purposes for which the properties were originally acquired:

1.  13.5 acres (13.5 acre tract) located directly north of the prison compound at the confluence of Cottonwood and Roubideau Creeks. *See* Detail Map, Ex. 9. The parties agree that this parcel was purchased with federal aid monies. *See* Ex. A–10;

2.  An area immediately adjacent to the entire perimeter of the prison (buffer zone). The parties agree that the property north of the DCC was purchased with federal funds. The property to the west, east, and south of the prison was purchased with state license fee revenues;

3.  40 acres (40 acre tract) located east of the "buffer zone" east of the DCC in the northeast portion of Section 32. *See* Ex. 5. The parties agree that federal aid

monies were used to purchase this property;

4. Rock quarry located on approximately 8 acres located within the federal aid land north of the DCC. The parties agree that federal aid monies were used to purchase this property;

## B. Fair Market Value

In *Delta I*, I determined that the construction and operation of the DCC upon two tracts of land, 82.74 acres upon which the DCC is located, and 31.1 acres located immediately south of the DCC, constituted a diversion as defined in 50 C.F.R. § 80.4 pursuant to the P–R Act. *See* Detail Map of Prison Compound, Ex. 5. Pursuant to the P–R Act, DOW sold these two tracts to DOC. Central to the adequacy of the cure of diversion is analysis of the fair market value of these two tracts of land. *See Delta I*, 29 F.Supp.2d at 1202.

The issues addressed at trial concerned whether there was either, as applicable, a misuse or diversion of the various tracts of land. In addition, the parties presented evidence as to the adequacy of any cure attempts. These questions are resolved with reference to the Pittman–Robertson Act.

## C. Pittman–Robertson Act, § 16 U.S.C. 669, et seq. (P–R Act)

The P–R Act provides in part:

[t]he Secretary of the Interior is authorized to cooperate with the States, through their respective State fish and game departments, in wildlife-restoration projects ...; but no money apportioned under this chapter to any State shall be expended ... until [the State] shall have assented to the provision (sic) of this chapter and shall have passed laws ... which shall include a prohibition against the diversion of license fees paid by hunters for any other purpose than the administration of said State fish and game department....

The Secretary of the Interior and the State fish and game department of each State accepting the benefits of this chapter, shall agree upon the wildlife-restoration projects to be aided in such State under the terms of this chapter....

16 U.S.C. § 669. Thus, the P–R Act provides federal matching grants to states for wildlife restoration projects funded jointly by a state and the USFWS. To qualify for federal matching funds, commonly referred to as "federal aid monies" or "P–R monies," a recipient state must agree to use its state hunting license fees solely for wildlife purposes. § 16 U.S.C. § 669. The P–R Act further requires the state to enact legislation making it unlawful for the state to use its own license fee monies for any purpose other than wildlife.

P–R Act federal aid monies can be used only for wildlife restoration projects defined to mean:

[t]he selection, restoration, rehabilitation, and improvement of areas of land or water adaptable as feeding, resting, or breeding places for wildlife, including acquisition by purchase, condemnation, lease, or gift of such areas or estates or interests therein as are suitable or capable of being made suitable therefore, and the construction thereon or therein of such works as may be necessary to make them available for such purposes.

16 U.S.C. § 669a.

The P–R Act further restricts how state license fee revenues are spent. The term "license revenues" is defined to include income from the "sale, lease, rental, or other granting of rights of real or personal property acquired or produced with license fee revenues." 50 C.F.R. § 80.4(a)(2). A state, like Colorado, that has assented to the P–R Act's terms may use its license fee monies only for the administration of its fish and game department. *See* 16 U.S.C. § 669; 50 C.F.R. § 80.14. Thus, the P–R Act places mandatory restrictions on a recipient state's use of its own state monies and state wildlife areas for non-wildlife purposes such as highways, prisons, or schools. *See Delta I*, 29 F.Supp.2d at 1204.

Pursuant to 16 U.S.C. § 669i, the Secretary of the Interior has promulgated rules and regulations for carrying out the P–R Act's provisions. *See generally* 50 C.F.R. part 80. Consequently, just as a state cannot spend matching federal aid monies on a non-approved project, a state cannot use real property acquired with federal aid monies for any purpose other than that previously approved by the USFWS. *Id.*

According to the regulations, real property acquired or constructed with federal aid funds must continue to serve the purpose for which it was acquired or constructed. *See* § 80.14(b). Therefore, if a state purchases real property for use as a wildlife area with any federal aid monies, the property must continue to be used as a wildlife area.

The regulations also restrict a state's use of real property acquired with state license fee monies. *See* § 80.4(a)(2). If a state uses land acquired with federal aid monies for a non-approved purpose, the state is considered to have "misused" the federal aid monies, pursuant to § 80.14(a). *See* § 80.14(a); *Delta I*, 29 F.Supp.2d at 1204. If a state spends license fee monies on a non-approved purpose or uses land acquired with license fee monies for a non-approved purpose, the state is said to have "diverted" those license fee monies pursuant to § 80.4(c). The regulations contain explicit, separate remedies for "diversion" or "misuse."

## 1. Diversion

"A diversion of state license fee revenues occurs when any portion of license revenues is used for any purpose other than the administration of the State fish and wildlife agency." 50 C.F.R. § 80.4(c). If a diversion occurs, the state becomes ineligible to participate under the P–R Act from the date the diversion is declared by the Director until:

1. adequate legislative prohibitions are in place to prevent diversion of license revenue, and;

2. all license revenues or assets acquired with license revenues are re-

stored, or an amount equal to license revenue diverted or current market value of assets diverted (whichever is greater) is returned and properly available for use for the administration of the State fish and wildlife agency.

*See* 50 C.F.R. § 80.4(d)(2).

## 2. Misuse

As discussed in *Delta I,* "[m]isuse" of federal aid monies occurs when such funds are not "applied only to activities or purposes approved by the regional director. If otherwise applied, such funds must be replaced or the State becomes ineligible to participate." 50 C.F.R. § 80.14(a); *Delta I* at 1205. Section 80.14 provides further:

(b) real property acquired or constructed with Federal Aid funds must continue to serve the purpose for which it was acquired or constructed.

(1) When such property passes from management control of the fish and wildlife agency, the control must be fully restored to the State fish and wildlife agency or the real property must be replaced using non-Federal funds. Replacement property must be of equal value at current market prices and with equal benefits as the original property. The State may have a reasonable time, up to three years from the date of notification by the regional director, to acquire replacement property before becoming ineligible.

(2) When such property is used for purposes which interfere with the accomplishment of approved purposes, the violating activities must cease and any adverse effects resulting must be remedied.

(3) When such property is no longer needed or useful for its original purpose, and with prior approval of the regional director, the property shall be used or disposed of as provided by

Attachment N of OMB Circular A–102.

50 C.F.R. § 80.14.

## IV.

### Claim one—42 U.S.C. § 1983 violation pursuant to the Pittman– Robertson Act

**A. Adequacy of the cure as to the 82.74 acre and 31.1 acre tracts**

In *Delta I,* I determined that pursuant to 50 C.F.R. § 80.4, a diversion of state license fee monies occurred in connection with the 82.74 acre and 31.1 acre tracts comprising the prison compound. At trial, the parties presented evidence concerning the adequacy of the cure of the diversion with respect to the fair market value of these tracts.

Pursuant to § 80.4(d)(2), to cure the diversion of state hunting and fishing license fees: 1) the DOC must return the current market value of the diverted assets to DOW; and 2) the monies returned must be available for use for the administration of the State fish and wildlife agency. *See id.*

To determine the current market value of the diverted land, the DOW retained certified real estate appraiser Michael R. Nash to appraise the 90.99 acres on which the DCC is located. On October 19, 1995, Mr. Nash appraised the 90.99 acres and concluded that the fair market value was $63,000 or approximately $692 per acre. Ex. A–6, p. 62. The DOC retained certified real estate appraiser Robert Stevens to appraise the 31.1 acres immediately south of the DCC. Mr. Stevens conducted his appraisal on November 6, 1997 and concluded that the fair market value of the 31.1 acre tract was $29,500 or approximately $950 per acre. Based on these appraisals, pursuant to the MOA, the DOW transferred to DOC title to: 1) 82.74 acres of the 90.99 acre tract for $60,287.44 on May 31, 1996; and 2) the 31.1 acre tract for $29,500.00 on March 31, 1998.

Plaintiffs presented the expert testimony of real estate appraiser Robert Maddox who appraised the 90.99 acres at $3,000 per acre for a total value of approximately $366,000.

At trial, the appraisers testified concerning the basis for their opinions. To calculate the fair market value of the land, each determined, in their opinion, the "highest and best use" of the land. The "highest and best use" of land is defined as "[t]he reasonable probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." Ex. 59, pp. 0369–70 *citing The Appraisal of Real Estate* (Tenth Ed). Next, each appraiser used the sales comparison approach to determine the value of the land. This method is "a process of comparing the subject property to sales of similar, competing properties with adjustments being made for differences in size, location, or other market recognized differences." *Id.* at p. 0371.

Mr. Maddox described the subject land as: 1) having the "excellent amenity of water frontage on Roubideau Creek;" and 2) producing "homesites representative of the better 'view lots.' " *Id.* He then compared the land to five properties in the area with similar attributes including "a good view" and "creek frontage." *See* Grid Analysis, Ex. 64, p. 0435. Based on this data, Mr. Maddox concluded that the subject property was valued at $3,000 per acre.

In October 1995, Mr. Nash appraised the 90.99 acres employing the same methodology and determined that the highest and best use of the land would be large acreage (35 acres or more) single family homesites. *See* Ex. A–6, p. 356. After analysis of seven comparable properties, he concluded that the fair market value of the 90.99 acres was $63,000 or approximately $692 per acre. *See id.* at p. 406. At trial, Mr. Maddox stated that in forming his opinion, he took into account the non-irrigated nature of the 90.99 acres.

In November 1997, Mr. Stevens appraised the 31.1 acres immediately south of the prison utilizing the sales comparison approach. He concluded that the highest and best use of the property was agricultural. However, the comparable land sales he examined were suitable for either agricultural or large acreage residential use. Mr. Stevens testified that in his opinion, the fair market value of the 31.1 acres was $29,500 or approximately $950 per acre.

After consideration of the experts' testimony, I am persuaded by Mr. Stevens' testimony that the fair market value of the 31.1 acres is $950 per acre. Mr. Stevens was asked to explain the discrepancy between his valuation of $950 per acre and Mr. Maddox' estimate of $3,000 per acre. Mr. Stevens informed the court that he had personally inspected the comparables upon which Mr. Maddox relied. He stated that the most glaring distinction was the availability of irrigation water on most of the properties Mr. Maddox' used in his appraisal. Mr. Stevens testified that it is significant that the subject land was unirrigated.

In addition, Mr. Maddox factored into his appraisal the value of the "excellent amenity of water frontage on Roubideau Creek." *See* Ex. 59, p. 0371. In contrast, Mr. Stevens testified that Roubideau Creek is, most of the year, "little more than a glorified ditch." Stevens Testimony, March 3, 1999. Indeed, it is undisputed that for part of the year, Roubideau Creek is a dry creek bed.

As to the discrepancy between Mr. Stevens' valuation of the 31.1 acre tract at $950 per acre and Mr. Nash's valuation of the 90.99 acre tract at $692 per acre, I credit the unrebutted testimony of Mr. Nash that the market has gotten stronger since he appraised the 90.99 acres in October 1995 and Mr. Stevens' appraisal 2 years later. I credit Mr. Stevens unrebutted explanation of the difference in value of the 82.74 acres contained in the 90.99 acre tract and the 31.1 acre tract.

I agree that the lack of availability of irrigation water and the questionable value of water frontage on Roubideau Creek are significant factors in the determination of the fair market value of the land. In addition, the difference between Mr. Nash's and Mr. Stevens' appraisal is minimal taking into account the two-year lapse in time between Mr. Nash's 1995 appraisal and Mr. Stevens' 1997 appraisal during which time the value of the land increased. Based on the foregoing, I credit Mr. Nash's and Mr. Stevens' respective expert opinions as to the fair market value of the two tracts of land.

Based on Mr. Nash's expert opinion, I find that the fair market value of the 82.74 acre tract at the time of the transfer to cure was approximately $692 per acre or $57,256.00. Based on Mr. Stevens testimony, I find that the fair market value of the 31.1 acre tract at the time of the transfer to cure was approximately $950 per acre for a total of $29,500.00.

█ The parties agree that the Department of Corrections paid the Division of Wildlife $60,287.44 to cure the diversion of the 82.74 acre tract. The fair market value of the 82.74 acre tract at approximately $672 per acre is $57,256.00. Therefore, the DOC paid DOW approximately $3,000 more than the fair market value of the 82.74 acre tract. Thus, there has been an adequate cure of the diversion of the 82.74 acre tract.

The parties agree further that DOC paid the DOW $29,500 to cure the diversion of the 31.1 acre tract, the amount found by Mr. Stevens to equal the fair market value of the 31.1 acres. Hence, the DOC has fully cured the diversion of the 31.1 acre tract.

## B. Determination of misuse or diversion

Plaintiffs contend that despite being purchased with federal monies and state license fee revenues, several parcels of land surrounding the prison compound no longer serve the original wildlife life purpose for which they were acquired:

1. a 13.5 acre parcel due north of the prison compound in Section 29 (13.5 acres) purchased with federal aid monies. *See* Exs. 5; A–10;

2. approximately 37 acres of land located in Section 29 north of the prison compound and surrounding the 13.5 acre parcel purchased with federal aid monies. *Id.;*

3. approximately 8 acres of land in Section 29 north of the prison compound upon which a rock quarry is located (Rock Quarry) purchased with federal aid monies. *Id.;*

4. a 40 acre tract east of the prison in the northeast corner of Section 32. (40 acre tract), purchased with federal aid monies. *Id.;* and

5. a buffer zone comprising approximately 243 acres of land directly surrounding the prison to the east, south, and west (buffer zone) purchased with state license fee monies. *Id.*

The parties stipulate that:

the "Escalante State Wildlife Area was originally purchased to provide habitat for mule deer and associated recreational opportunities for big game hunters, as well as habitat for small game and waterfowl and associated wildlife related recreational opportunities."

Revised Final Pretrial Order, p. 5.

Land purchased with federal aid monies must remain in the management control of the State fish and wildlife agency or must be replaced using non-federal aid monies. In addition, the property must continue to serve the purpose for which it was acquired. *See* 50 C.F.R. § 80.14. If such property is used in a way that interferes with the accomplishment of approved purposes, the violating activities must cease and any adverse effects resulting must be remedied. *Id.*

The parties have stipulated to the source of the funds used to purchase these land parcels. *See* Ex. A–10. Based on the funding source, the question is whether, under the facts of this case, there has been a diversion or misuse of the land. If a diversion or misuse exists, the question then is one of appropriate remedy to cure the diversion or misuse.

**1. 13.5 acres**

The 13.5 acre parcel contains a segment of the public road accessing the portion of the Lower Roubideau Tract of the ESWA surrounding the DCC, a public parking area for the general public visiting the ESWA, and a small pond. Plaintiffs contend that the 13.5 acre tract is no longer useful for wildlife purposes.

At trial, Robert Towry, the DOW habitat and wildlife manager, certified as an expert in wildlife management, testified that the 13.5 acre tract is under the control of and managed by the DOW. There was conflicting trial testimony whether the 13.5 acre tract continues to serve the purpose for which it was acquired.

It is undisputed that at one time, the 13.5 acres contained a lure crop field area which was irrigated by a portion of the Ringwood ditch. Also, the tract contained shrubs and grass providing cover for small game. Now, the Ringwood ditch is dry and there are no lure crop fields. The area has been bulldozed and contains no vegetation except a few cottonwood trees and weeds.

Plaintiffs' witnesses Tom Huerkamp, Claude White, David Huerkamp, and Rick Saxton testified that the 13.5 acre tract could not be hunted safely because of its proximity to the DCC. Mr. Towry testified that the 13.5 acre tract contains a parking area and provides public access to the adjacent lands where the public can hike, view wildlife, and hunt within safety constraints.

Based on the testimony presented, I find and conclude that although the character of the 13.5 acre tract has changed over the years, it provides public access to the lower Roubideau portion of the ESWA. Accessibility is a crucial function in accomplishing the wildlife purposes for which the land making up the ESWA was purchased. Hence, I find and conclude that use of the

13.5 acre tract for access to the ESWA is consistent with the original purpose of the purchase of the land to provide, *inter alia,* "associated wildlife related recreational opportunities." *See* Stipulation 2, Revised Final Pretrial Order, p. 5. Therefore, the 13.5 acre tract "continues to serve the purpose for which it was acquired...." *See* 50 C.F.R. § 80.14(b).

**2. approximately 37 acres of land located in Section 29 north of the prison compound and surrounding the 13.5 acre parcel. *See* Ex. 5;**

It is undisputed that the 37 acres of land located in Section 29 due north of the DCC and surrounding the 13.5 acre parcel, was purchased with federal aid monies. Plaintiffs' wildlife expert Dennis Boyle opined that the 37 acre tract no longer serves its original purpose because it cannot be safely hunted due to its close proximity to the DCC. Defense experts, Mr. Towry and Mr. John Ellenberger testified that the so called "buffer zone," including the 37 acre tract of land, surrounding the DCC continues to serve both habitat and recreational purposes. Mr. Towry testified that habitat in the area remains much as it has in the past. In addition, he testified that the public can generally recreate and can watch wildlife in this area. Mr. Ellenberger testified that although big game were displaced by the construction of the DCC, the area surrounding the DCC remained available for wildlife use.

■ Under these circumstances, I find and conclude that the Plaintiffs have failed to carry their burden of showing that the 37 acre tract no longer serves its original purpose. Thus, there is no diversion of the 37 acres under the P–R Act.

**3. Rock Quarry**

Also at issue is a rock quarry located on approximately 8 acres of land north of the DCC in Section 29 between Cottonwood Creek and the entrance road to the DCC. The parties agree that the 8 acres were purchased with federal aid monies. *See* Ex. A–10. Claude White, retired DOW

wildlife biologist, testified that in the 1950's, the land on which the rock quarry is located consisted of grasses and low shrubs that provided habitat for quail and cotton tail rabbits. At some point, the DOC bulldozed the top of the 8 acres exposing the rock below the surface. Presently, the 8 acre surface is predominantly solid rock. Mr. Towry testified that quarried rock was used to construct sign posts, for decorative work at the DCC, and to construct walls within the prison.

■ I find and conclude that the 8 acres on which the rock quarry is located no longer serves the purpose for which it was originally purchased. Thus, pursuant to § 80.14(2), the rock quarry activities must cease and the adverse effects of the rock quarry on the land must be remedied. DOC and DOW executed a special use agreement whereby the DOC is responsible for any reclamation work that would be required to restore the 8 acres to its former condition. Therefore, pursuant to § 80.14(2) and the special use agreement, DOC shall, as soon as feasible, restore the 8 acres upon which the rock quarry is located to its former condition.

**4. 40 acre tract**

The DOW used federal aid monies to purchase a 40 acre tract located east of the DCC in the northeast corner of Section 32, *See* Ex. A–10. Mr. White testified that the DOW originally purchased the 40 acres to consolidate the ESWA land holdings to better utilize all of the land for wildlife purposes. The portion of the 40 acre tract bordering the Roubideau Creek is comprised of thick grasses, cottonwood trees, and low shrubs. The upper half is rather steep. Mr. White testified that the 40 acre tract no longer serves its original purpose because the location of the DCC restricts access to the 40 acres. To obtain access from the east side, a person must walk along a very narrow path along Roubideau Creek and at some point cross the creek. The other way to access the 40 acres is to

walk south around the western side of the prison, cut across in front of the prison's target range, and then climb a steep hill to the 40 acre tract. In addition, Mr. White stated that the 40 acre tract cannot be hunted safely because of the proximity of the DCC.

Mr. Towry testified, however, that the 40 acre tract continues to provide wildlife habitat, is available for recreation, and could be hunted taking into account appropriate safety considerations. Also, he stated that the area around the prison is available for the general public to recreate by walking and viewing wildlife. Mr. Towry stated further that the 40 acres in within the management and control of the DOW.

■ I find and conclude that Plaintiffs have failed to meet their burden to show by a preponderance of the evidence that the 40 acre tract no longer serves the purposes for which it was acquired. The ESWA remains consolidated, in part due to the purchase of the 40 acres. Moreover, the 40 acre tract provides habitat for wildlife. Though somewhat inconvenient, there is public access to this tract. Therefore, there is no diversion pursuant to § 80.14.

### 5. 243 acres (Buffer Zone)

■ Plaintiffs contend that approximately 243 acres of land directly surrounding the prison to the east, south, and west (buffer zone) no longer serve the wildlife purposes for which they were originally acquired. I disagree.

Plaintiffs' witnesses Boyle, Tom Huerkamp, and David Huerkamp testified unequivocally that the location of the DCC prevented hunting in the areas directly west, south, and east of the prison due to safety concerns. Another of Plaintiffs' witnesses, Mr. White, stated, however, that hunting with a shotgun was possible within hunting safety constraints. In addition, Mr. Ellenberger testified that small game hunters could use shotguns on the 243 acres surrounding the DCC. He stated further that hunters could use bows and arrows or muzzle loading guns to hunt any

portion of the buffer zone. Moreover, Mr. Ellenberger testified that the big game animals have habituated to the presence of the DCC. He has observed mule deer tracks and droppings in the vicinity of DCC. Also, mule deer feed on landscaping next to the DCC buildings. In addition, Plaintiffs' witness David Huerkamp testified that the area "in and around the prison" is "some of the better habitat." D. Huerkamp testimony, March 1, 1999. Therefore, I find no diversion pursuant to § 80.14.

### 6. Signs and Motion Detectors

As a final matter, Plaintiffs contend that DOC's placement of signs and motion detectors on portions of the ESWA interfere with the use of the area for wildlife purposes. It is undisputed that the use of signs and motion detectors by DOC is authorized by an agreement between DOC and DOW. The USFWS had input into the agreement and agreed to the placement of their logo on one of the signs.

#### a. Signs

At trial, there was conflicting testimony about the location of DOC signs and the information contained on the signs. Tom and David Huerkamp testified that the signs cautioned against carrying weapons onto DOC property or discharging firearms. Tom Huerkamp testified that the placement of the signs led to confusion concerning the location of boundaries between the ESWA and the DCC. He stated that until recently, one sign was located on G Road quite a distance from DCC's entrance. *See* Ex. A–10. Also, there were other signs located on the public road leading to the prison entrance (prison access road). *Id.*

David Huerkamp confirmed the testimony of his brother. He stated that there was a sign located near the 13.5 acre tract indicating that the entire area was under the control of the prison. This sign also informed the public about possible felony charges for weapons violations. *See* Ex.

71. There was further testimony, however, that the sign location and misinformation have been cured. Tom Huerkamp testified that the signage changed recently. Mr. Towry testified that the sign near the 13.5 acre tract has been moved onto the grounds of DCC. Brian Burnett, DOC Director of Finance and General Administration, testified that currently, there is a sign near G Road that says "Delta Correctional Center" with an arrow. This sign provides information about parking and camping and states "Delta Correctional Center controlled access 150 yards." Two more signs are located along the prison access road detailing the ESWA boundaries, the prison location, and setting out regulations concerning weapons and ammunition on the DCC grounds. Mr. Burnett stated that state law requires signage at the front of all DOC facilities with the specific language contained on these signs.

Mr. Burnett testified also that a sign located on the 40 acre tract incorrectly designates that land as private. He stated that with the permission of the DOW, DOC would change the sign to correctly inform the general public that the 40 acre tract of land is part of the ESWA.

■ Under these circumstances, I find and conclude that the previous signs misled the general public as to the location and boundaries of the ESWA and the DCC. I find and conclude further that the public was discouraged from using the ESWA for wildlife purposes through a combination of the location of the signs some distance from the prison boundaries and language on the signs concerning weapons and ammunition. Therefore, the property was "used for purposes which interfered with the accomplishment of approved purposes...." § 80.14(b)(2).

Pursuant to § 80.14(b)(2), "the violating activities must cease and any adverse effects resulting must be remedied...." *Id.* Based on the trial testimony, with the exception of the sign containing incorrect information located on the 40 acre tract, Defendants have ceased and remedied the violating activities by correcting the improper and misleading content and location of the signs. Therefore, the misuse has been cured except as to the 40 acre tract sign.

b. **Motion Detectors**

Mr. Burnett testified that there are two solar powered motion detectors located along the prison access road that alert the DCC control center to movement along the road including cars traveling either direction on the road. Testimony was presented that as a result of the motion detectors, DOC employees have stopped vehicles on the prison access road and approached members of the public walking on the ESWA to question them about their activities. *See* Tom Huerkamp testimony, March 1, 1999; Stephen Boyle testimony, March 1, 1999. Mr. Towry testified that he called the DCC warden and advised him to instruct the prison personnel to cease contacting the public outside the parameters of the DOC property. He stated that to his knowledge, these contacts have ceased.

■ I agree with Mr. Towry's advisement to the DOC. The DOC employee's contacts with the public on non-DOC property are subject to the United States Constitution and, in particular, the Fourth Amendment to the United States Constitution.

Although as a result of the motion detectors, the public was discouraged from using the ESWA for wildlife purposes, based on Mr. Towry's testimony that the contacts have stopped, I conclude that the P–R Act violation has been cured.

Accordingly, IT IS ORDERED, ADJUDGED, and DECLARED that:

1. judgment shall enter FOR PLAINTIFFS AND AGAINST DEFENDANTS on claim one as follows:

a. **Rock Quarry**

The placement and operation of a rock quarry on land purchased with federal funds for wildlife purposes constitutes a misuse in violation of 50 C.F.R.

§ 80.14(b)(2). The State Defendants SHALL CEASE any further rock quarry activities and SHALL REMEDIATE as soon as feasible, all adverse effects by restoring the 8 acres upon which the rock quarry is located, to its former condition;

**b. Signs**

The placement of certain signs in combination with the information contained on the signs created a misuse. The misuse has been cured by the relocation of the signs in all instances except on the 40 acre tract. To cure the misuse created by the incorrect information on the sign located on the 40 acre tract, Defendant Department of Corrections SHALL CORRECT the sign to accurately reflect that the 40 acre tract is part of the Escalante State Wildlife Area and open for public use;

**c. Motion Detectors**

Defendant Department of Correction's placement of motion detectors on the public road through the Escalante State Wildlife Area does not constitute a misuse. The actions of Defendant Department of Corrections's personnel in contacting persons on property owned by the Division of Wildlife creates a misuse under the Pittman–Robertson Act.

The Colorado Department of Corrections shall CEASE and DESIST from contacting the general public on non-Department of Corrections property except as is consistent with the Fourth Amendment of the United States Constitution;

2. judgment shall enter FOR DEFENDANTS AND AGAINST PLAINTIFFS on claim one as follows:

**a. 82.74 acre tract**

The amount of $60,287.44 paid by Defendant Department of Corrections to the Division of Wildlife IS ADEQUATE TO CURE the diversion of the 82.74 acre tract;

**b. 31.1 acre tract**

The amount of $29,500.00 paid by Defendant Department of Corrections to the Division of Wildlife IS ADEQUATE TO CURE the diversion of the 31.1 acre tract;

c. There is NO VIOLATION of 42 U.S.C. § 1983 based on a misuse as defined by 50 C.F.R. § 80.14 pertaining to the Pittman–Robertson Act, 16 U.S.C. §§ 669–6691 as to:

i. the 13.5 acre parcel due north of the prison compound in Section 29;

ii. approximately 37 acres of land located in Section 29 north of the prison compound and surrounding the 13.5 acre parcel; and

iii. the 40 acre tract east of the prison in the northeast corner of Section 32;

d. There is NO VIOLATION of 42 U.S.C. § 1983 based on a diversion as defined in 50 C.F.R. § 80.4 pertaining to the Pittman–Robertson Act, 16 U.S.C. §§ 669–669l as to the buffer zone comprised of approximately 243 acres of land directly surrounding the prison to the east, south, and west;

3. each party SHALL BEAR their own attorney fees and costs; and

4. the Clerk of the Court SHALL ENTER final judgment in this matter consistent with this Order.